All right, is the appellant ready to proceed? You may. May it please the Court, I'm Doug Lang, representing the appellate, along with Katie Clark, who will conduct the rebuttal, and Cameron Edward, counsel. This is about the denial of objections to discharge of a debtor, Mr. Matloff, brought by his former secured creditor, who was objecting to several issues in an adversary proceeding, all of which the Bankruptcy Court unfortunately denied. In 2017, as your prior panel found, TGL, Triumphant Gold Limited, lent over $11 million to the rooftop companies owned and run by Mr. Matloff. Collateral was provided in the way of accounts receivable and the proceeds of it. That was agreed to. They were supposed to go into a special account. I'm going to address issues 2 and 3 in particular, and will rely on a brief as to issues 1 and 4. Issues 2 and 3 deal with what Mr. Matloff did with our collateral, which was he converted it and left TGL. To be clear, when you say 2 and 3, you're talking about the Section 727 claim as number 2 and 3 as 523A6? Yes, Your Honor, exactly. What Mr. Matloff did was he converted the collateral. He admittedly, unabashedly, said when he was in default, his companies were in default, I'm going to transfer these accounts receivable because I'm afraid TGL is going to exercise its rights. It frees the accounts where all these monies were going, and I want to save the companies. What did he do over a period of 2018 into 2019 before they filed bankruptcy? He transferred $41 million of accounts receivable that was the collateral for TGL. TGL's debt wasn't nearly that, but when they went into bankruptcy, all of it was gone. Mr. Matloff transferred that money through a couple of accounts in his rooftop companies, and it went to a third party, not owned by him, not owned by the rooftop companies, Amex, a Chinese company, who he said, I'm putting the money over there so they can pay the creditors. The court allowed Mr. Matloff to defend both the 523-A-6 as well as the 727-A-2 positions. As you know, Issue 3, 523-A-6 provides for dischargeability of a particular debt. It provides in part that debtor will not be discharged from the debt for willful and malicious injury by the debtor to another or the property of another entity. 2 is, as to general discharge, 727-A-2 provides that a court will grant a discharge unless it is shown that the debtor, with the intent to hinder, delay, or defraud, or, it's very important, has transferred or caused to be transferred assets of the debtor. So do all four of your grounds for objection to dischargeability involve an intent, a nefarious intent, or some type of scienter, whether we call it fraud or something less than fraud? Do all four of these objections involve a finding that the debtor engaged in something intentional, or do any of these qualify as what I always understood as avoidable preference? Well, there is scienter, Your Honor. And in particular, 523-A-6, the willful? I understand. I'm asking if any of these four do without an intentional, a finding of intent. Well, actually, the failure to keep the records doesn't require negligence can be the standard there. And we presented ample evidence that he just didn't keep books, and he was excused because it was hard. A company going downhill, well, that's not a surprise. So what we're looking at is 523-A-6.  Sorry. Did you know about the failure to keep the books before you extended credit to Mr. Matloff? Well, there was an investigation of his books, and they were satisfied that they could see some of the things that were going on. They were not ignorant. They relied on what there was there. They had people go in and churn through it. Yeah. But he made representations that, you know, he's going to do all these things, and he guaranteed the debt. So that's not something that the lender should be defaulted on. Well, no one's suggesting that the lender shouldn't be faulted. I mean, we see bankruptcy appeals with some regularity, and secured creditors come, and they say, hey, we had a perfected interest. You know, we're a secured creditor. We got hosed in this deal. We're getting pennies on the dollar. And in some ways, that's the essence of bankruptcy, right? So really the question that I understand in the appeal, right? I mean, we would love for every creditor in every bankruptcy to get paid 100 cents on the dollar. Wouldn't that be great? It would be wonderful for everybody, but insolvency usually doesn't work that way. And so the question really to me in this case is why would you get the death penalty against Mr. Matloff? If he comes to you and says, I'm just giving you, right, that you've got a fact that, in fact, he says I'm going to pay back the million-dollar bonus. Well, like every debtor in bankruptcy says, I'm going to pay back a debt and then doesn't pay it back. That's literally why they're in bankruptcy. So I'm having a hard time understanding why this case is so extraordinary. Well, it's extraordinary because the bankruptcy code requires a debtor to do certain things in certain ways. And if they default under 523A6 or 727A2, they can't just be excused and say, the devil made me do it, you know? And you shouldn't have lent me negligent lending. My gosh, that's not fair. I've heard that for years. It just simply isn't in the cards on an objection to discharge. And we've got a situation where there's an objective and a subjective standard of harm that goes into 523A6. And that is looking at what he did. Was it willful and malicious? We contend his admissions, several of them, said, I'm telling you, I'm in default. I'm going to take this money and I'm going to run. In fairness, he didn't take the money and run. He took the money. Look, no one's saying that what he did was right. Obviously, you had a secured interest and he acted in derogation of it. That shouldn't happen. But it's not like he took the money and bought a plane and absconded to the Seychelles Islands. He took the money and gave it to a different entity to try to keep the company afloat. And we've said you're allowed to do you're allowed to take reasonable steps to avoid bankruptcy. And he said he was doing it for the benefit of his creditors, including TGL. So how is that malicious? You know, reasonable steps under the case law is they have to be in good faith at arm's length, standard process of business. This wasn't standard to steal, to take collateral and ship it off to a third company so nobody could get it. Now, there was no evidence except for Mr. Mantloff that said I shipped it off so they could pay some creditors. Not all of them. Some of them. That just doesn't work. It doesn't satisfy it. Inree Miller from this court in 1998 went through this intent situation and the standards, the objectives, subjective standard. And it said that an injury, willful or malicious, to create an injury is the wrongful sale or conversion of encumbered property. That's what it said. And the measure is what you lost. We lost all of our collateral, $41 million that he admitted across examination that the bankruptcy court simply didn't look at. It was all gone. He absconded with it. We don't know where it went. And so what we have is Inree Miller says those are the standards, but with an intentional injury. It was certainly intentional. He said he was going to do it. It cannot be justified or excused. So I'm getting hung up on your understanding of the willfulness requirement. So part of what I'm hearing you say is, look, we had a security interest in the accounts receivable. He acted in derogation of our security interest. We lost $41 million, which I think that's news to me. I thought you lost more in sort of the order of like $8 million. But whatever. You lost millions. I'm with you.  Therefore, no discharge. Why would it matter if he had said anything about it? What does the state of his mind matter? Because if he says, look, I did it to give it to charity. I did it to buy my girlfriend a private plane. I did it because I'm trying to pay my creditors. From what I'm hearing you say today, it doesn't really matter what his reasons were, right? As long as he admits that he. It doesn't because he didn't have consent. So how is that not. The Henry Green case from this court in 2020 dealt with a very complex case about conversion of accounts receivable. And this court said an inference of malice includes such as converting property in which the lender holds a security interest. And there was no consent. And so the bankruptcy code is clear. The statute is clear. It needs to be applied according to its plain language. And so excuses don't show up. The bankruptcy court was wrong as a matter of law by accepting his excuse both in 523A6 as well as 727A4 and just said, I'm sorry. Now 727A2 is a little bit different because it goes to the overall discharge intent to hinder, delay, or defraud. The bankruptcy court made a major mistake. And that was to say, you must prove fraud. Not so. Not so. Hinder, delay, or defraud is conjunctive. And this court pointed that out in Henry Wiggins in 2017 where this court was dealing with a situation where a bankruptcy trustee was going to try to avoid the transfer by a debtor before bankruptcy of part of his homestead to his wife to try to insulate her from being involved in bankruptcy. Well, 548 deals with hinder, delay, or defraud. And this court made it very clear. Conjunctive, that or, makes a big difference here. There are three different mindsets, hinder, delay, or defraud. And it looked at Shapiro case from 1932, I believe, the United States Supreme Court that said you can defraud, but as well, hinder or delay is also violative. And it looked at two cases in particular, one from the Ninth Circuit. When you said he didn't have consent, what were you referring to? What he should have asked? Your Honor, well, conversion is the wrongful taking of property. And the wrongful taking is when you just go take it. It's classic conversion. If there were consent, if there were an issue on that, we'd be in a different ballgame altogether. But there was no consent. When he was notified in February of 2018, a little over a year before bankruptcy, that he was in default, he sent an email to Danny Yee of TGL, an American owner of this company. And he said, I think you guys are going to freeze my accounts. So I've got no alternative but to pass this money elsewhere. I'm going to get it out of those accounts. And he admitted that at trial, the same doggone thing. And the fact of the matter is he also admitted at trial, and we've given the court excerpts on this from the record, he also admitted that $41 million of accounts receivable that were generated in 2018 were all gone. He transferred them all, and nobody had a security interest in that $41 million except TGL. It's all laid out there, Your Honor. It is clear, no consent, just wrongful taking, classic. And that's what this court has dealt with all the way back in 1991, where it addressed a little bit prior to Henry Miller, but the same thing. Henry Montague, 1991. Injury encompasses the wrongful sale and conversion. Wrongful is, without consent, you just took it because you wanted to. It doesn't matter what the reason is, because it's not a classic situation of anything you can make up. There was no reason that is countenance by law for him to be able to do that. So on both of these counts, the trial court erred. And as a matter of fact, there's enough evidence in the record under de novo review for this court to apply the law correctly and render. We've been here twice. It's always good to see the court, but we believe the court can exercise its ability to render by applying the law to the facts. Thank you, Mr. Lane. Thank you, Your Honor. Mr. Cooley? May it please the Court. Good afternoon, Your Honors. My name is Michael Cooley, and I represent the FLE Darren Matloff. It's a privilege to be here. I'd like to actually start, before I get into my prepared remarks, I'd like to start by responding to the questions. That you asked, Judge Oldham and Judge Engelhardt. Judge Oldham, you asked if the TGL considered the documents to be in the books and records to be in an acceptable form at the time they made the loan. And I think the answer to that question would be yes. And the reason we know that is because at that time, the books and records of the company were being primarily maintained and overseen by the Chief Financial Officer, Tian Chu, who Judge Mullen spoke about at length in his ruling, having found evidence of real conflicts of interest between Mr. Chu and TGL. But to your question, at that time, the CFO and his entire accounting staff, which he had built out to administer this much more complex international organization that Rooftop had grown into, he was still there. Judge Engelhardt, to your question, you asked if all four of the counts require intent. And the categorical answer is yes, they do. 523A2 requires an intent to mislead, an intent to make a false representation that you know to be false or to commit fraud. 523A6 requires quite literally willful and malicious intent. 727A2 does not require or does not contemplate constructive fraudulent transfers, which I think the Court alluded to, but only contemplates actual fraud, a transfer with the intent to hinder, delay, or defraud. And finally, 727A3 requires a finding that the debtor failed to maintain books and records, the debtor concealed documents or so forth. And the legislative history to 727A2, 3, and 4 specifically states that the statute is meant to focus on the conduct of the debtor and not some other party. So it's not something—it may be something that could be done negligently, but there is absolutely a causation factor that you cause this to happen. 727A3 does not come about because the warehouse where you store your books and records burned to the ground. There was no intent. Just bad things sometimes happen. Counsel, what do you make—your friend on the other side says conversion of a secured interest, that's it. There was a secured interest in accounts receivable. Your client converted that, the end. Case is over. Discharge denied. Do we have cases—he says he's got multiple cases, which I'll obviously read very carefully, that say that's the rule, that's the law, that's the plain text of the bankruptcy code. Do you have authority on your side to suggest that's not right? Yes, Your Honor, and there are two issues there. There's a legal issue and a factual issue. The factual issue is, did TGL ever even prove that an injury was sustained? And the problem here is that the court found that they did not, and that is a factual matter, not a legal one. At trial, they testified that the debt they sought to accept was the $8.14 million that represented the allowed amount of their claim, the amount arising under the guarantee. And they said that they were entitled to that under 523A6, independent of any subsequent willful and malicious acts. That's in the record at 21822. But there was no evidence at trial of $8 million, or for that matter, $41 million, of TGL collateral that was converted. It's true that TGL had a security interest on the debtors' accounts receivable and purchase orders. It is also true that at this point in time, as you'll see in the briefing, the receivables were being factored through a third-party factor called star funding, and that during this period, it was actually about $45 million in 2018 and 2019, of which about $41 million was factored by star funding who had the senior lien. The money didn't go out the door. The money was factored through star funding, and you'll find this in the record in a variety of places, but I would direct the Court to 96, 52, and 53 of the record, where there is a summary of the amounts factored to star funding versus to TGL. And as of the roughly $3.37 million that was not factored to star funding in 2018, $2.9 million of that went to repay or make payments to TGL and Poehler during that period at 18144-47 of the record. I would remind the Court that TGL here—we talked about a 100-cent plan, a 100-cent case, if only— TGL loaned over the life cycle of this relationship $21 million, roughly, and change, and were repaid over time $22 million and change. The reason we're here is because there were upwards of 60 percent interest rates being charged, such that not enough of that went to repay the principal balance, but TGL got a lot of money back. They didn't get everything, but they got a lot. Now, TGL also tried to prove injury as the result of any one of four different baskets of transfers. You'll have seen these described in the briefing as well. The first one was $846,000. This, by the way, when counsel talks about the admission of what Mr. Matloff did, that he admitted what he was doing, the admission in the testimony refers only to this $846,000, not to the $41 million. And you'll find that in the transcripts as well. The $846,000, though, the problem with that was, as the bankruptcy court noted, this money represented funds pulled from four different, what were called at trial, frozen balances. These were funds that were—well, frozen balances representing the collateral proceeds of four different secured creditors, of which TGL was one. And at trial, by tracing or otherwise, TGL was not able to demonstrate to the court how much, if any, of their dollars were reflected by that $846,000. And yet, Mr. Yee conceded at trial that he did not presume to say that he would have rights, consent or otherwise, over another creditor's collateral. Also, it was shown at trial that the purpose of those funds was to pay emergency bills. That's at page 112 of the record. The second basket was $176,000. That was shown to be for payroll-related items, and Mr. Yee testified that he did not object to the same. And the other baskets were actually referring to amounts deposited into the checking account, not transfers out. And TGL was not able to show of the $11 million worth of transfers made during that period, which part of it they contended represented their collateral. That is, there's a compilation of that at 20260 of the record. And so, there is this underlying factual issue that TGL failed to satisfy. Your question, though, was what about the law? And on the legal question, I would submit, respectfully, that TGL is flat wrong when it says that this court's decision in the Volbracht case, decided nine years after Miller, is not applicable here. In the Volbracht decision, the Fifth Circuit panel took full account of the Supreme Court's decision in Geiger, and took full account of the Miller decision that TGL points to, and said that an injury levied as a legitimate response to someone else's actions cannot be willful and malicious under 523A6. Consequently, and this is a quote, we hold that our two-part test, the objective subjective test, must countenance the actions of the injured party. That decision was not limited to any fact pattern. Rather, the court held that an injury quote must satisfy our two-part test and not be sufficiently justified under the circumstances. That is the law of this circuit. And that law, by the way, is consistent with the position taken in virtually every other circuit, every other circuit that I've been able to find, which is that post-Geiger, an act must still be without just cause or excuse in order to be malicious for 523A6. In the Second Circuit, that's Ball v. A.O. Smith at 451F3rd66. In the Sixth Circuit, CMCO Mortgage at 957F3rd704. In the Seventh Circuit and Ninth Circuits, they have reached the same conclusion. And so applying that standard, Your Honor, TGL's claim is belied by evidence of the aggressive efforts of Mr. Matloff and Rooftop to repay TGL and other creditors, including $2.9 million to TGL and Poehler in 2018, of which over $1.3 million went to TGL in the first quarter of 2018 alone. At the same time, those frozen balances were being transferred to Rooftop. There was the finding that TGL failed to rebut the extensive testimony regarding Mr. Matloff's desire to preserve the business. And there were the extensive findings by the Bankruptcy Court regarding the relationship between TGL and Tian Chu, including that TGL placed significant confidence in Mr. Chu and relied upon him for financial and accounting-related matters. You'll find this in particular at pages 46 to 48 of the record, but you will find no mention of Mr. Chu in TGL's briefing. Turning back to the 727A2 claim, the other one that my friend described, this particular issue, we said it in the briefing and I'll say it here again briefly, this particular issue, that it was legal error to fail to consider hindered delay separately from defraud, was not raised on appeal to the District Court, record at 375. In fact, quite the contrary, at the District Court, TGL told the court that, quote, evidence of actual intent to defraud creditors is required. That's 22398 of the record. And TGL embraced the same badges of fraud analysis that was employed by the Bankruptcy Court, both in their District Court reply at 22764 and in their Bankruptcy Court post-trial briefing at 20087. Now, I appreciate that in their statement of issues here and in their statement of issues at the District Court, the talismanic phrase, as we bankruptcy lawyers think of it, hindered delay or defraud, is present. But it's not enough to merely intimate at an issue. This court held in Bergman v. Babcock that to be preserved, an argument must be pressed and not merely intimated. But turning to the merits of that issue, I honestly don't know where TGL gets the idea, which they articulated in their brief at page 28, that evidence of actual intent is not required. This court has said repeatedly, as have other circuits, that evidence of actual intent to defraud creditors is required to support a finding sufficient to deny discharge. Constructive intent is insufficient. And so when the Bankruptcy Court said actual intent to defraud is required, constructive intent is insufficient, it was saying, I believe, exactly as this court said in Chastant and Cadle v. Duncan, actual intent is always required. Now, as a shorthand, we invariably say intent to defraud, because the overwhelming majority of these cases involve defraud rather than hinder or delay. I recognize that there is a shorthand there. But the Bankruptcy Court used the exact same shorthand that this court and other courts have used, this court in Cadle and Chastant. And frankly, TGL, as I said, made the exact same point to the District Court in their briefing. Actual intent is required. So how do we do that? Well, this court once again gave us the answer in the Wiggins decision. And this court said some of those badges of fraud that we typically rely upon are also useful in determining the intent to hinder or delay. And the court went on to say that it's not necessary for the analysis to fit precisely within the traditional category of fraudulent badges so long as there is, quote, sufficient evidence, to your point, of improper intent. That is straight from Dennis v. Robertson from this court some years back. And that is what the Bankruptcy Court did. The Bankruptcy Court applied a contextual analysis. You'll find it in the record at pages 117, 125, 128, including to examine whether the transaction served a legitimate business purpose at 117 and 126, citing the Moreno case from this circuit. And the Bankruptcy Court concluded that TGL failed to establish that the transferred funds were its collateral, that the transfers were actually part of an established business practice. The fund transfers to AMAX, as the records reflect, represented a change in the intermediary being used but were a continuation of a practice that had been in place not only for some time but a practice that predated TGL's lending relationship to the company. As the record shows, and you'll see in our trial briefing, that intermediary relationship to facilitate the payment of creditors, particularly in China, was a practice that had gone on for years and was just an integral part of this. AMAX was used as a successor intermediary, and I forget what the issue was, but when the old intermediary could no longer do it. But the Bankruptcy Court also found that the transfers were intended to benefit TGL by preserving the business and that they enabled payment of actual rooftop manufacturing expenses, not, Judge Oldham, as you suggested, to buy an airplane and head off to the Seychelles Islands. These are all findings that are reviewable only for clear error, and we submit that TGL falls well short. I will talk for a moment. I've got just a couple of minutes left. On the 523A2 claim, this argument, I understand the argument that they're raising, and on the surface it might feel like a legal issue, justifiable reliance versus reasonable. And that argument might make sense if the evidence at trial had established that Mr. Matloff had represented the existence of a $1 million bonus or had promised to pay a $1 million bonus. In that event, Field v. Manns does say that TGL is justified in relying on that factual representation without conducting an investigation. But what was the representation here? The side letters make no mention of a $1 million bonus. They say, they refer to, quote, the bonus paid to Matloff in 2017. And as the Bankruptcy Court noted at page 94 of the record, there's nothing in the side letters to indicate any specificity around the dollar amount or anything to do with what this bonus was. And TGL didn't try to prove at trial that Mr. Matloff had said, I got a $1 million bonus, fellas, and let me know what you want to do with it. The evidence at trial was that the reason they thought they knew it was a $1 million bonus was because they had discovered a million dollars of advances, quote, in our subsequent due diligence at 21771 of the record. And they say in the briefing at pages 10 and 26 that it was TGL's investigation that revealed to them the details of the bonus upon which they allegedly relied. But that was not Mr. Matloff's representation. That was their investigation, they say. But at trial there was no documentary evidence, there was no corroborating evidence of this investigation, only Mr. Yee's own testimony. At 21771 and 21838 and 21835, when he could not produce any corroborating documents. And so instead of purporting to justifiably rely on something Mr. Matloff said to them, they were here purporting to justifiably rely on the product of their own investigation. And the real problem was at trial, they were what the evidence showed that what actually this was was a million dollars that had been owed to Mr. Matloff before as unpaid sales commissions and was re-characterized in the audited financials for reasons that are unclear in the record, was re-characterized as a debt that he owed. We don't know what happened, but we know it was at Mr. Chu's hands. Your Honor, the Bankruptcy Court here did its job over the course of a four-day trial with six live witnesses, four more by deposition, hundreds of exhibits, resulting in a 140-page opinion with over 400 record citations. In the words of the Supreme Court in U.S. v. Lake Ridge, U.S. Bank v. Lake Ridge, the Bankruptcy Court marshalled and weighed the evidence, made credibility judgments, and otherwise addressed what we have called multifarious, fleeting, special, narrow facts that utterly resist generalization, the very essence of a clear error review. And so I will end sort of where I began with this. The Bankruptcy Court, we submit, did its job, and for that reason, I would ask the Court to affirm the Bankruptcy Court's denial of relief on all counts. Thank you, Counsel. Thank you. Ms. Clark. Yes, thank you. Catherine Clark on behalf of the appellant. Judges, I'd like to start with the question that was asked with respect to, isn't the deal often, most often, in fact, when a debtor enters a Chapter 7 bankruptcy that creditors are going to be getting pennies on the dollar and that's just the way that things are? Yes, that's true. As a bankruptcy practitioner, that is what we see. But a secured creditor is not to be denied its collateral just because there is a Chapter 7 bankruptcy filing. Rather, your contractual rights being securitized, that is something that is a property right of the lender. And so here, what we have is we have a debtor, before he filed for bankruptcy, roughly a little bit over a year before he filed bankruptcy, saying to the lender, I see that you have a security interest in my accounts in Asia. I don't want to respect that security interest any longer and, therefore, these monies that are in the account now will be transferred to the United States and then I will not be putting any more monies from this business, despite my agreement, despite your security interest in the accounts receivable, those will not be going back to that account. And that sets up the concern of Triumphant Gold. That sets up the claim of Triumphant Gold for conversion and that is the claim that Triumphant Gold was seeking to have declared non-dischargeable, in particular, under 523A6. So what do you do with Volbrecht? What do we do with Volbrecht? I'm glad that you asked that. I was going to go with that, Your Honor. Yes, so with respect to Volbrecht... Obviously, it does not involve a secured interest, but in many ways involves a much more intentional harm. It's literally a fight. Yes, exactly. Involving actual punching and actual face contusions. Exactly, Your Honor. And so if we look at the Miller case, the court is very clear. Where injury is intentional, it cannot be excused. And then we go to Volbrecht and the court says that the injury must satisfy our two-part test and not be sufficiently justified under the circumstances to render it not willful and malicious. But before that statement, Your Honor, and very importantly, and in fact, Mr. Cooley referenced this, they say we hold that our two-part test must countenance the actions of the injured party. So as it relates to self-defense, when two people are fighting one another, I punch you, you punch me, we both intend to injure one another. And so if we're just looking at the plain language of the statute and we look at the Miller test, there's no way to get out of it, well, this becomes a problem. And so what did the creditor that is claiming it is injured, what did it do in the context of a fight to deserve, if anything, being punched in the face? That is a reasonable inquiry, at least that this circuit has found, in the instance of a self-defense. Yeah, so the way you're losing me, like, I hear everything you're saying, and if the bankruptcy judge had listened to all of this testimony and thought about all of this and sided with you, then, like, obviously it would be a totally different case and they would be the ones asking us to overturn it and we would, you know, there's no doubt that the bankruptcy court could side with you under 523. The question, though, is does the bankruptcy judge have to side with you under 523? Your friend who argued on the top side of this, your co-counsel, said, look, once there's a conversion, the case is over. Conversion of a secured interest, it is over, and I read Volbrecht and it says the exact opposite. Right? It says, no, no, no, in order to find willfulness and maliciousness, we have to look at what Mr. Matloff did, quote, under the circumstances, to determine whether what he did was malicious and willful. Yes. And so that's, really, you've got a fact question about, quote, under the circumstances. So there's two issues that we presented in our briefing, Your Honor, and that I would respond to your questions about. And that is, one, this bankruptcy court said that there was a four-part test and one of those, under 523, and one of those was that the harm was not sufficiently justified under the circumstances. And what I've just stated to the court as our position is that Volbrecht creates a very narrow exception, not under all the circumstances, but under the circumstances when you consider the actions of the injured party, that being the creditor. So to state that there is a blanket exception that changes the In re Miller Court statement that where injury is unintentional, it cannot be excused, that is an incorrect statement of the law. And so then to apply a broad test of an exception, that is an incorrect legal premise. And so the facts were weighed incorrectly. So that's number one. Number two is that this court has also said, in the case of In re. Modicu and others, that when a debtor admits that there is an intention, an intention that falls under the statute, there is no need to weigh circumstantial evidence and it shouldn't be weighed. And so here, the court weighing circumstantial evidence in and of itself was error. And Your Honors asked, why is this case unique? Well, that is why this case is unique, especially as to our issues two and three, and that's because Mr. Matloff admits I am breaching not just my contract, not just I'm not going to pay you, but I'm breaching the security interests that I agreed that would be granted to you by my companies, and then goes on to basically ignore this global enterprise that he has established pursuant to the loan documents, comes to the United States, operates a business for a year, transfers the business for his own benefit to AMAX, where he goes to work, and that is what we end up with, that AMAX business ended up with the benefit. And so I see that my time is up, Your Honors. I would just ask that the court look at this entire record and for the four errors that we presented, determine that this decision be reversed and rendered on the record. Thank you. Thank you, Counsel. The court will take this matter under advisement. We're going to take a recess until 2 p.m.